# CV 14-0054

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DANIEL MADISON and RAQUEL
MADISON,

     Plaintiffs,

  -against-

THE CITY OF NEW YORK, P.O. RIVERA,
and JOHN DOE AND JANE DOE #1-3 (the
names John and Jane Doe being fictitious, as
the true names are presently unknown),
     Defendants.
-------------------------------------------------------------X

Case No.

**COMPLAINT**

JURY DEMAND

**ORENSTEIN, M.J.**

Plaintiffs, DANIEL MADISON and RAQUEL MADISON, by their attorney, The Law Offices of UGO UZOH, P.C., complaining of the defendants herein, The City of New York, P.O. Rivera, and John Doe and Jane Doe #1-3 (collectively, "defendants"), respectfully allege as follows:

## NATURE OF THE ACTION

1.  This is an action at law to redress the deprivation of rights secured to the plaintiff under color of statute, ordinance, regulation, custom, and/or to redress the deprivation of rights, privileges, and immunities secured to the plaintiff by the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States, and by Title 42 U.S.C. §1983 [and § 1985], [and arising under the law and statutes of the City and State of New York].

## JURISDICTION

2.  The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1343, 28 U.S.C. § 1331 and 28 U.S.C. § 1367, and under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

3.  As the deprivation of rights complained of herein occurred within the Eastern District of New York, venue is proper in this district pursuant to 28 U.S.C. §1391 (b) and (c).

## COMPLIANCE WITH N.Y. GEN. MUN. LAW REQUIREMENTS

4.      Plaintiffs timely made and served their respective notice of claims upon the defendants in compliance with N.Y. Gen. Mun. Law § 50-e.

5.      At least thirty days have elapsed since the service of aforesaid notice of claims and adjustment or payment thereof has been neglected or refused.

6.      This action is commenced within one year and ninety days after the happening of the event(s) upon which the claim(s) are based.

### THE PARTIES

7.      Plaintiffs, husband and wife, are and were at all times material herein residents of the United States and the State of New York.

8.      At all relevant times, defendants P.O. Rivera, and John Doe and Jane Doe #1-3 (hereinafter "defendant officers") were, upon information and belief, and still are, agents and/or officers employed by defendant City of New York.

9.      At all times herein, the defendant officers were acting under the color of their official capacity, and their acts were/are performed under color of the statutes and ordinances of the City of New York and/or the State of New York. Defendant officers were/are the servants, agents, and employees of their co-defendant, the City of New York, such that their acts are imputed to the City of New York.

10.     At all relevant times, the defendant City of New York was and is a municipal corporation duly organized and existing under the laws of the State of New York, and was/is the employer of the defendant officers, and the actions of the defendant officers complained of herein were done as part of the custom, practice, usage, regulation and/or at the direction of the defendant City of New York.

11.     Plaintiffs are suing the defendant officers in their individual and official capacities.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

12.     On or about May 6, 2013, at approximately 9:30 p.m., defendant officers, acting in concert, arrested Mr. Madison without cause at a Mobil Gas Station

which is located at 113-85 Merrick Boulevard, Queens, New York, and charged Mr. Madison with VTL 1102 'Obedience to police officers and flagpersons' and VTL 375(2)(a)(1) 'Equipment'.

13. Mr. Madison, however, was not operating any motor vehicle upon a public highway at the time, did not refuse to comply with any lawful order or direction of any police officer or flagperson or other person duly empowered to regulate traffic and did not commit any offense against the laws of New York City and/or State for which any arrest may be lawfully made.

14. Prior to the arrest, Mr. Madison who resides in Queens, New York, was visiting his brother who resides a few miles away from him in Queens, New York, when he realized that his right headlight had turned off on its own.

15. Mr. Madison had experienced a similar problem a few days prior and did manage to turn on the headlight at that time by tapping on it.

16. Upon realizing that the headlight had turned off, Mr. Madison immediately parked his vehicle at the aforementioned location/Mobil Gas Station.

17. Mr. Madison then exited the vehicle, opened the hood and proceeded to tap the headlight to turn it on.

18. Shortly thereafter, Mr. Madison lifted his head up.

19. As Mr. Madison lifted his head, he realized that he was surrounded by defendant officers who were approximately two (2) feet away from him.

20. Defendant officers immediately inquired as to what Mr. Madison was doing and proceeded to ask him "[w]hat are you doing tonight [], sir?"

21. Mr. Madison duly advised defendant officers that he was going to his brother's house to watch a basketball game involving the New York Knicks and another professional basketball team.

22. Mr. Madison then inquired as to the reason why he was surrounded by defendant officers.

23. Instead of responding to Mr. Madison's inquiry, defendant officers asked him "have you been drinking tonight, sir?"

24. Defendant officers then leaned into Mr. Madison and attempted to smell his breath.

25.     Defendant officers then stated that Mr. Madison smelled like he had been drinking and asked Mr. Madison to go back into his vehicle and sit down.

26.     Mr. Madison inquired again as to the reason why he was surrounded by defendant officers and stated that he merely stopped to fix his headlight and did not do anything wrong.

27.     Instead of responding to Mr. Madison's inquiry, defendant officers again directed Mr. Madison to go back into his vehicle and sit down.

28.     Defendant officers made several derogatory comments concerning Mr. Madison and called Mr. Madison a "stinking, f***ing a**hole".

29.     Mr. Madison got back into his vehicle and sat down as he was directed by defendant officers.

30.     After Mr. Madison got back into his vehicle, defendant officers took a few steps to the rear of the vehicle and huddled up.

31.     As defendant officers huddled together, Mr. Madison called his wife on her telephone to inform her of the situation.

32.     As Mr. Madison was engaged in a telephone conversation with his wife, defendant officers approached Mr. Madison and directed him to immediately hang up his telephone and end the conversation.

33.     Mr. Madison duly advised defendant officers that he was on the telephone with his wife and that he wanted to let his wife know what was going on.

34.     Defendant officers again directed Mr. Madison to immediately hang up his telephone and end the conversation.

35.     Mr. Madison did as he was directed and immediately hung up on his wife.

36.     After Mr. Madison hung up his telephone, defendant officers opened Mr. Madison's door and arrested Mr. Madison.

37.     When Mr. Madison inquired as to the reason for the arrest, defendant officers stated that they were going to administer a breathalyzer test upon Mr. Madison and would release him if he wasn't drunk.

38.     Defendant officers stated that they did not have a tester or breathalyzer calibration equipment with them and that they could only administer the test at the NYPD-113th Precinct.

39.     Defendant officers tightly handcuffed Mr. Madison with his hands placed behind his back.

40.     After handcuffing Mr. Madison, defendant officers twisted Mr. Madison's arms and forcibly shoved Mr. Madison into their police vehicle causing Mr. Madison to experience pain and anguish.

41.     Defendant officers proceeded to perform an illegal and warrantless search of Mr. Madison's vehicle.

42.     Even though defendant officers did not find anything illegal, defendant officers nonetheless arrested Mr. Madison and also impounded Mr. Madison's vehicle.

43.     After arriving at the NYPD-113th Precinct, defendant officers informed Mr. Madison that they were unable to administer the breathalyzer test at the location and that they would have to transport him to NYPD-112th Precinct for the test.

44.     Upon arriving at the NYPD-112th Precinct, defendant officers handcuffed Mr. Madison to a wall with his pants down.

45.     Eventually, after a lengthy period of time, a highway patrol officer brought a tester or breathalyzer calibration equipment to the NYPD-112th Precinct and administered a breathalyzer test upon Mr. Madison.

46.     Upon administering the test, the highway patrol officer noted that Mr. Madison scored or registered .000.

47.     The highway patrol officer then inquired from defendant officers as to the reason why Mr. Madison was arrested and directed defendant officers to release Mr. Madison immediately as he was not drunk.

48.     Initially, defendant officers uncuffed Mr. Madison.

49.     As soon as the highway patrol officer departed from NYPD-112th Precinct, however, defendant officers tightly handcuffed Mr. Madison again with his hands placed behind his back.

50.     When Mr. Madison inquired as to the reason for his continued arrest and detention, defendant officers stated that Mr. Madison did not get back into

his vehicle fast enough when he was directed by defendant officers to get back into his car at the scene of the arrest.

51. Defendant officers then proceeded to process Mr. Madison's arrest and detained Mr. Madison at the precinct for a lengthy period of time.

52. Mr. Madison was detained in an unkept cell with poor sanitary conditions and without any mattress, and was forced to lie down on a bare floor that was covered in urine and feces.

53. After detaining Mr. Madison for a lengthy period of time at the NYPD-112th Precinct, Mr. Madison was transported to the Central Booking to await arraignment.

54. While Mr. Madison was awaiting arraignment, defendant officers met with prosecutors employed by the Queens County District Attorney's Office.

55. During this meeting, defendant officers falsely stated to the prosecutors, among other things, that Mr. Madison operated a motor vehicle with a broken headlight upon a public highway at nighttime and refused to comply with a lawful order of defendant officers.

56. Based on the false testimony of the defendant officers, a prosecution was commenced against Mr. Madison.

57. On or about May 7, 2013, following Mr. Madison's arraignment, the false charges levied against Mr. Madison were summarily dismissed.

58. Ms. Madison and the plaintiffs' daughter, Raquel Madison, Jr., attended Mr. Madison's arraignment to show their support

59. Both Ms. Madison and the plaintiffs' daughter took time off from work in order to attend Mr. Madison's arraignment.

60. After defendant officers cut off Ms. Madison from her husband and ended their conversation prematurely, Ms. Madison set out to find her husband -- petrified and traumatized by the entire situation.

61. Upon arriving at the Mobil Gas Station location of the arrest, which is located a few minutes away from their home, Ms. Madison learned from the gas station attendant that her husband was arrested by defendant officers.

62. Ms. Madison then proceeded to the NYPD-113th Precinct.

63.     Upon arriving at the NYPD-113th Precinct, Ms. Madison observed her husband's vehicle where it was parked outside by defendant officers.

64.     While at the NYPD-113th Precinct, Ms. Madison learned that her husband's vehicle was impounded as he was allegedly arrested for driving while intoxicated.

65.     Ms. Madison also learned that her husband was detained at the NYPD-112th Precinct.

66.     Ms. Madison then proceeded to the NYPD-112th Precinct.

67.     Upon arriving at the NYPD-112th Precinct, Ms. Madison was advised by defendant officers that they were waiting to administer a breathalyzer test upon her husband.

68.     Ms. Madison requested defendant officers to release her husband's vehicle to her.

69.     Defendant officers refused to release her husband's vehicle to her.

70.     Ms. Madison then left and returned home.

71.     After a few minutes, Ms. Madison received a telephone call from her husband.

72.     Ms. Madison learned from her husband that his breathalyzer test result was .000 but that defendant officers still detained him and levied other charges against him.

73.     Ms. Madison was then advised by her husband that defendant officers had released his vehicle to her and that defendant officers had asked her to come to the precinct and take the vehicle home.

74.     Ms. Madison then proceeded to head back to the precinct with the plaintiffs' son, Daniel Madison, Jr.

75.     Upon arriving at the precinct, Ms. Madison met with defendant officers.

76.     Ms. Madison inquired as to the reason why her husband was arrested and charged with operating a motor vehicle with a broken headlight upon a public highway at nighttime but defendant officers were willing to release the same vehicle which still remained in the same condition to her to drive home at nighttime.

7

77.  Ms. Madison then sought assurances from defendant officers that they would not arrest her and her son when they drive away in the vehicle.

78.  Defendant officers assured Ms. Madison that she and her son would not be arrested and that they could drive the vehicle home the same night notwithstanding the fact that the headlight had not been fixed.

79.  Upon entering into the vehicle, Ms. Madison discovered that the vehicle was thoroughly searched and that several items were moved around, damaged and/or missing.

80.  Ms. Madison then went back into the precinct and lodged a complaint against defendant officers concerning the unlawful and warrantless search of the vehicle.

81.  On the basis of the assurances by defendant officers, Ms. Madison and her son drove Mr. Madison's vehicle upon a public highway at nighttime and took the vehicle home while Mr. Madison remained incarcerated.

82.  While driving the vehicle home, Ms. Madison and her son observed a rattling sound emanating from the tires and also observed that the interior of the vehicle was soaked with water.

83.  Following his release from his unlawful incarceration, Mr. Madison was forced to expend a substantial amount of money in fixing the damages to his vehicle caused by defendant officers.

84.  That each and every individual and/or officer who responded to and/or was present at the location of the arrest and assault described herein knew and was fully aware that Mr. Madison did not commit any crime or offense, and had a realistic opportunity to intervene to prevent the harm detailed above from occurring.

85.  Nonetheless, defendant officers did absolutely nothing to discourage and prevent the harm detailed above from occurring and failed to intervene.

86.  As a result of the aforesaid actions by defendant officers, plaintiffs suffered and continue to suffer emotional distress, fear, embarrassment, humiliation, shock, discomfort, loss of liberty, pain and damage, financial losses, and damage to reputation.

FIRST CAUSE OF ACTION: 42 U.S.C. § 1983

87.    By this reference, plaintiffs incorporate each and every allegation and averment set forth in paragraphs 1 through 86 of this complaint as though fully set forth herein.

88.    The conduct of defendant officers, as described herein, amounted to false arrest, excessive use of force, malicious abuse of process, failure to intervene, deliberate indifference, poor conditions of confinement, cruel and inhuman treatment, cruel and unusual punishment, unlawful stop and frisk, unreasonable detention, unreasonable search and seizure, racial profiling, selective enforcement, pattern of harassment, conspiracy, abuse of authority, unlawful entry, fabrication of evidence, denial of freedom of speech, first amendment retaliation, denial of right to familial association, denial of equal protection of the laws, discrimination, denial of right to a fair trial, denial of due process rights and malicious prosecution.

89.    Such conduct violated plaintiffs' rights under 42 U.S.C. § 1983 and the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

90.    Consequently, plaintiffs have been damaged and hereby demand compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

SECOND CAUSE OF ACTION: FAILURE TO TRAIN/SUPERVISE/DISCIPLINE AND MUNICIPAL POLICY - against defendant City of New York

91.    By this reference, plaintiffs incorporate each and every allegation and averment set forth in paragraphs 1 through 90 of this complaint as though fully set forth herein.

92.    Defendant City of New York, acting through the New York Police Department, had actual and/or de facto policies, practices, customs and/or usages of failing to properly train, supervise or discipline its police officers concerning correct practices in conducting investigations, the use of force, interviewing of witnesses and informants, assessment of the credibility of witnesses and informants, reasonable search of individuals and/or their properties, the seizure, voucher and/or release of seized properties, obligation

9

not to promote or condone perjury and/or assist in the prosecution of innocent persons and obligation to effect an arrest only when probable cause exists for such arrest.

93.     Additionally, defendant City of New York, acting through District Attorney Richard A. Brown and the Office of the District Attorney of the Queens County, had actual and/or de facto policies, practices, customs and/or usages of failing to properly train, supervise, and discipline its Assistant District Attorneys and employees concerning correct practices in conducting investigations, interviewing witnesses and informants, assessing the credibility of witnesses and informants, the initiation and/or prosecution of criminal actions, obligation not to promote or condone perjury and/or assist in the prosecution of innocent persons and the duty and/or obligation of candor toward the court.

94.     Defendant City of New York, acting through aforesaid NYPD and District Attorney, had actual and/or de facto policies, practices, customs and/or usages of wrongfully arresting, illegally stopping, frisking, searching, seizing, abusing, humiliating, degrading and/or maliciously prosecuting individuals who are members of racial/ethnic minority groups such as plaintiffs, who are blacks, on the pretext that they were involved in some crime or offense.

95.     Further, the existence of the aforesaid unconstitutional policies, practices, customs and/or usages may be inferred from repeated occurrences of similar wrongful conduct.

96.     For example, in *Floyd v. City of New York*, 813 F. Supp. 2d 417, 422 (S.D.N.Y. 2011), the Southern District of New York observed that the City of New York had been accused of racial profiling on multiple occasions and that it had settled at least one of the lawsuits brought against it concerning racial profiling.

97.     In *Ligon v. City of New York*, 12 Civ. 2274, 2013 U.S. Dist. LEXIS 22383, at *9-*10 (S.D.N.Y. Feb. 14, 2013), the Court determined that the City of New York, acting through the NYPD, engages in unlawful stop and frisk. *See also*

*Davis v. City of New York*, 10 Civ. 0699, 2013 U.S. Dist. LEXIS 45601 (S.D.N.Y. March 28, 2013) (same).

98.     Additionally, NYPD Police Officer Michael Carsey was recently convicted of felonies for lying under oath and falsifying information while applying for a search warrant.

99.     Police Officer Carsey's supervisor, Sergeant William Eiseman, had earlier admitted to fabricating facts to justify searching vehicles and homes for cocaine, marijuana and guns, filing false information to obtain search warrants and performing illegal searches of vehicles and homes. That Sergeant Eiseman admitted to perjury and fabricating evidence against innocent persons that he falsely arrested and charged with possession of narcotics and/or illegal drugs, and also admitted to training numerous young police officers to commit similar crimes and/or offenses.

100.    In addition, in or about October 2011, Detective Stephen Anderson testified against Detective Jason Arbeeny, a veteran of the NYPD. Detective Anderson testified that, among other things, it is a common practice within the NYPD to plant narcotics and/or illegal drugs -- commonly known within the NYPD as "flaking" -- on innocent persons in order to meet arrest quotas. Detective Anderson referred to the practice of planting narcotics and/or illegal drugs on innocent persons as "attaching bodies" to the narcotics and/or illegal drugs. According to Detective Anderson, this practice "was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators."

101.    Regarding the issue of arrest quotas, Detective Anderson confirmed that the NYPD requires officers to fill quotas, and testified that even as a detective "you still have a number [of arrests] to reach while you are in the narcotics division."

102.    Recently, a jury determined that officers of the NYPD are permitted, as a policy and/or practice, to fill their arrest quotas by making unlawful arrests. *See Bryant v. City of New York*, Index No. 22011/07 (Sup. Ct. County of Kings Feb. 18, 2011).

103.    Prior to his testimony, Detective Anderson and his partner provided false testimony in court claiming that they purchased cocaine from certain individuals who as surveillance video later confirmed did not have any sort of contact or communication with Detective Anderson and his partner during the time period that Detective Anderson and his partner claimed to have purchased the controlled substances and/or illegal drugs.

104.    Detective Arbeeny was subsequently convicted of planting controlled substances and/or illegal drugs on a woman and her boyfriend, and was convicted of the charges against him including official misconduct, offering a false instrument for filing and falsifying business records.

105.    Recently, the New York Supreme Court, County of Kings, Criminal Term, Gustin L. Reichbach, J., determined that the NYPD has a system of flawed procedures that caused Detective Arbeeny's unlawful actions. Judge Reichbach further determined that the NYPD has a widespread culture of corruption and has adopted a "cowboy culture" and practice which he described as "[a]nything goes. . . ." That Judge Reichbach expressed shock at what he described as "the seeming pervasive scope of misconduct [and even worse] . . . the seeming casualness by which such conduct is employed."

106.    Further, in or about 2008, the New York Supreme Court, County of Kings, Criminal Term, Albert Tomei, J., determined at a Mapp hearing in *People v. Simms*, Indictment No. 11263/07, which was held on or about September 9, 2008, that the police officers involved in the arrest in that matter are "not credible" and that the police officers' "testimony is so obviously fabricated . . . to avoid any Constitutional objections the defendant may have . . . and that [any] property taken . . . is to be suppressed because it was the product of an unlawful arrest and search and seizure."

107.    In addition to the instances of police misconduct described above, several officers of the NYPD -- including but not limited to Detective Christopher Perino, Police Officer Michael Daragjati, Police Officer Henry Tavarez, Police Officer William Masso, Detective Oscar Sandino, Detective Sean Johnstone, Sergeant Michael Arenella, Sergeant Jerry Bowens, Police

Officer Michael Pena, Police Officer Nicholas Mina, Detective Kevin Spellman, Sergeant Bobby Hadid and Police Officer Admir Kacamakovic -- have recently been convicted of various similar crimes as those described herein including but not limited to falsifying police reports, perjury, corruption, robbery, gun running, drug dealing, prostitution, theft and assault. Former NYPD Commissioner Bernard Kerik was also recently convicted of corruption and similar crimes as those described herein.

108.    Upon information and belief, many of the named individual defendants have a lengthy substantiated history of police misconduct, fraud and dishonesty. Further, many of the named individual defendants are named defendants in numerous lawsuits in this district and in the Southern District of New York alleging similar claims as those alleged herein -- many of which lawsuits have been settled by defendant City of New York with said defendant making substantial monetary payments to the plaintiffs in the said lawsuits.

109.    In addition to the named individual defendants, several officers of the NYPD assigned to the NYPD-112th Precinct and NYPD-113th Precinct -- as the named individual defendants -- routinely make unlawful arrests charging innocent persons with various crimes and/or offenses.

110.    Most of the arrests and charges made by officers assigned to the NYPD-112th Precinct and NYPD-113th Precinct are usually voided and/or dismissed by prosecutors for lack of evidence.

111.    Defendant City of New York has settled numerous lawsuits brought in this district against several officers assigned to the NYPD-112th Precinct and NYPD-113th Precinct concerning similar arrests and charges as those described herein. *See, e.g., Jennifer Wharton v. City of New York* (08 CV 5252).

112.    Defendant City of New York maintained the above described policies, practices, customs or usages knowing fully well that the policies, practices, customs or usages lead to improper conduct by its police officers and employees. In failing to take any corrective actions, defendant City of New

York acted with deliberate indifference, and its failure was a direct and proximate cause of plaintiffs' injuries as described herein.

113. The actions of defendants, acting under color of State law, deprived plaintiffs of their due process rights, and rights, remedies, privileges, and immunities under the laws and Constitution of the United States, treatise, ordinances, customary international law and norms, custom and usage of a right; in particular, the right to be secure in their person and property, to be free from abuse of process, racial profiling, the excessive use of force and the right to due process.

114. By these actions, defendants have deprived plaintiffs of rights secured by treatise, ordinances, customary international law and norms, custom and usage of a right, and the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

THIRD CAUSE OF ACTION: 42 U.S.C. § 1985

115. By this reference, plaintiffs incorporate each and every allegation and averment set forth in paragraphs 1 through 114 of this complaint as though fully set forth herein.

116. In an effort to find fault to use against Mr. Madison defendant officers conspired among themselves and conspired with other individuals to deprive plaintiffs who are blacks of their constitutional rights secured by 42 U.S.C. § 1983, and by the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to United States Constitution, because of their race, ancestry and/or ethnicity, and took numerous overt steps in furtherance of such conspiracy, as set forth above.

117. In light of the foregoing therefore, defendant officers engaged in a conspiracy designed to deprive plaintiffs of their constitutional and federal rights in violation of 42 U.S.C. § 1985.

118. As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiffs sustained the damages hereinbefore stated.

**FOURTH CAUSE OF ACTION: NEW YORK STATE CONSTITUTION, ARTICLE I, §§ 5, 6, 8, 11 & 12**

119.    By this reference, plaintiffs incorporate each and every allegation and averment set forth in paragraphs 1 through 118 of this complaint as though fully set forth herein.

120.    By reason of the foregoing, and by arresting, detaining and imprisoning Mr. Madison without probable cause or reasonable suspicion, and harassing and assaulting him and depriving the plaintiffs of due process and equal protection of laws, defendants deprived plaintiffs of rights, remedies, privileges, and immunities guaranteed to every New Yorker by Article I, § 5 (prohibiting cruel and unusual punishments), Article 1, § 6 (providing for due process), Article 1, § 8 (guaranteeing freedom of speech), Article 1, § 11 (prohibiting discrimination in civil rights and providing for equal protection of laws) & Article I, § 12 (prohibiting unreasonable searches & seizures) of the New York Constitution.

121.    In addition, defendant officers conspired among themselves and conspired with other individuals to deprive the plaintiffs of their constitutional rights secured by Article I, §§ 5, 6, 8, 11 & 12 of the New York Constitution, and took numerous overt steps in furtherance of such conspiracy, as set forth above.

122.    Defendant officers acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as officers, agents, or employees. Defendant officers' acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendant officers acted willfully, knowingly, and with the specific intent to deprive the plaintiffs of their constitutional rights secured by Article I, §§ 5, 6, 8, 11 & 12 of the New York Constitution.

123.    Defendants, their officers, agents, servants, and employees were responsible for the deprivation of plaintiffs' state constitutional rights.

FIFTH CAUSE OF ACTION: ASSAULT AND BATTERY

124.     By this reference, plaintiffs incorporate each and every allegation and averment set forth in paragraphs 1 through 123 of this complaint as though fully set forth herein.

125.     The conduct of defendant officers, as described herein, amounted to assault and battery.

126.     By reason of and as a consequence of the assault, Mr. Madison suffered and continues to suffer emotional distress, fear, embarrassment, humiliation, shock, discomfort, loss of liberty, pain and damage, and damage to reputation.

127.     Upon information and belief, defendant City of New York had sufficiently specific knowledge or notice of defendant officers' propensity for acts complained of herein and that their acts could reasonably have been anticipated. However, defendant City of New York failed to take any appropriate actions to assure plaintiffs' safety and security and failed to protect and/or safeguard plaintiffs' interests.

128.     That defendant City of New York's failure to assure plaintiffs' safety and security was a proximate cause of plaintiffs' injuries.

SIXTH CAUSE OF ACTION: OTHER NEW YORK TORTS

129.     By this reference, plaintiffs incorporate each and every allegation and averment set forth in paragraphs 1 through 128 of this complaint as though fully set forth herein.

130.     The conduct of the defendants, as described herein, amounted to false arrest/imprisonment, assault and battery, unlawful stop and frisk, unreasonable search and seizure, unreasonable detention, negligence, defamation, conspiracy, special injury, loss of consortium, malicious abuse of process, harassment, tortuous interference, abuse of power, fraud, trespass and malicious prosecution.

131.     Consequently, plaintiffs have been damaged and hereby demand compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

## SEVENTH CAUSE OF ACTION: NEGLIGENT & INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

132.   By this reference, plaintiffs incorporate each and every allegation and averment set forth in paragraphs 1 through 131 of this complaint as though fully set forth herein.

133.   The defendants engaged in extreme and outrageous conduct, intentionally and recklessly causing severe emotional distress to the plaintiffs.

134.   Plaintiffs' emotional distress has damaged their personal and professional lives because of the severe mental pain and anguish which were inflicted through deliberate and malicious actions including the assault, detention and imprisonment by defendants.

135.   Consequently, plaintiffs have been damaged and hereby demand compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

## EIGHTH CAUSE OF ACTION: NEGLIGENT HIRING AND RETENTION OF EMPLOYMENT SERVICES

136.   By this reference, plaintiffs incorporate each and every allegation and averment set forth in paragraphs 1 through 135 of this complaint as though fully set forth herein.

137.   Upon information and belief, defendant City of New York, through its various agencies and departments including the defendants in this action, owed a duty of care to the plaintiffs to prevent the physical and mental abuse sustained by the plaintiffs.

138.   Upon information and belief, defendant City of New York, through its various agencies and departments including the defendants in this action owed a duty of care to the plaintiffs because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated that an injury to the plaintiffs or to those in a like situation would probably result from such conduct described herein.

139.   Upon information and belief, defendant City of New York, knew or should have known through the exercise of reasonable diligence that defendant officers were not prudent and were potentially dangerous.

140.     Upon information and belief, defendant City of New York's negligence in hiring and retaining the defendants proximately caused plaintiffs' injuries.

Upon information and belief, because of defendant City of New York's negligent hiring and retention of defendant officers, plaintiffs incurred and sustained significant and lasting injuries.

WHEREFORE, plaintiffs respectfully pray judgment as follows:

a.     For compensatory damages against all defendants in an amount to be proven at trial;

b.     For exemplary and punitive damages against all defendants in an amount to be proven at trial;

c.     For costs of suit herein, including plaintiffs' reasonable attorney's fees; and;

d.     For such other and further relief as the court deems proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury.

Dated: Brooklyn, New York
       January 6, 2014

UGO UZOH, P.C.

By:     Ugochukwu Uzoh (UU-9076)
        Attorney for the Plaintiffs
        304 Livingston Street, Suite 2R
        Brooklyn, NY 11217
        Tel. No: (718) 874-6045
        Fax No: (718) 576-2685
        Email: u.ugochukwu@yahoo.com